1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**
9          **SOUTHERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11  GREAT AMERICAN ALLIANCE | Case No. 23-cv-1796-BAS-JLB |
| 12  INSURANCE COMPANY, | |
| | **ORDER:** |
| 13                                   Plaintiff, | |
| 14       v. | **(1) GRANTING PLAINTIFF'S** |
| | **MOTION FOR SUMMARY** |
| 15  CONTINENTAL CASUALTY | **JUDGMENT (ECF No. 35);** |
| COMPANY, | **AND** |
| 16 | |
| | **(2) DENYING DEFENDANT'S** |
| 17                                  Defendant. | **CROSS-MOTION FOR** |
| 18 | **SUMMARY JUDGMENT** |
| | **(ECF No. 36)** |
| 19 | |

20

21      This case is a dispute between two insurers over who is responsible for a settlement

22  in a personal injury lawsuit.  A resident slipped and fell in the common area of a housing

23  community.  He brought negligence and premises liability claims against the community's

24  homeowners' association ("HOA") and its manager—Curtis Management Company.

25      Several insurance policies potentially covered the resident's claims.  Defendant

26  Continental Casualty Company ("Continental") was the primary insurer for Curtis

27  Management.  Continental, however, refused to participate in the defense of the lawsuit.

28

23cv1796

Ultimately, the resident's lawsuit settled for $2.75 million. The HOA's primary insurer contributed $1 million, and the HOA's excess insurer, Plaintiff Great American Alliance Insurance Company ("Great American"), contributed the remaining $1.75 million.

Great American argues Continental's refusal to participate led to Great American contributing $1 million more than it should have as the excess insurer. Great American thus brings claims against Continental for declaratory relief, subrogation, and equitable indemnity. Continental contends its decisions to refuse to defend its insured and to deny coverage were justified.

Now before the Court are the parties' Cross-Motions for Summary Judgment. There are no material facts in dispute, and the case turns on the Court's interpretation of the insurance policies. For the following reasons, the Court grants Great American's Motion for Summary Judgment and denies Continental's Cross-Motion for Summary Judgment.

## I.    BACKGROUND

### A.    The Underlying Litigation

In July 2020, Eric Lovato sued the Windward HOA and Curtis Management in San Diego County Superior Court ("Underlying Litigation"). (Joint Stipulated Facts ("JSF") ¶ 1, ECF No. 39-1.) Lovato's complaint alleged that on December 22, 2019, he "tripped and fell on a dangerous single step located in a common area walkway near the clubhouse." (JSF ¶ 5.) Lovato claimed the Windward HOA and Curtis Management were negligent and failed to warn him of the dangerous condition on the property. (JSF Ex. 1.) Lovato's injury led to grave complications, and in August 2020, he lost his leg above the knee. (JSF ¶ 4, Ex. 3.)

### B.    The Insured

Lovato's claims against Curtis Management laid the groundwork for this dispute. At the time of the incident, Lovato lived in a rental unit that is part of the Windward Community in Oceanside, California. (*See* JSF ¶¶ 5, 9–10.) The community is a common interest development governed by the Windward HOA. (JSF ¶ 16.)

The Windward HOA contracted with Curtis Management "to manage the Association under the sole direction of the [HOA's] Board of Directors." (Ass'n Mgmt. Agmt. § A.1, JSF Ex. 5.) Curtis Management agreed to use "its best efforts and perform all measures necessary for the orderly management of the common area property" in the community. (*Id.* § B.1.) Curtis Management only had the authority to manage these common areas; it had no responsibility or authority to manage the community's "family units." (*Id.* § E.1.) The Windward HOA agreed to indemnify Curtis Management, with exceptions. (*Id.* § J.1.) The Windward HOA also agreed to name Curtis Management as an additional insured under the HOA's policies "if permitted by the insurance carrier." (*Id.* § I.2.)

## C.    The Insurance Policies

The Underlying Litigation impacted several insurance policies. Curtis Management had two primary policies for its association management business. (JSF ¶¶ 29–30.) Defendant Continental issued a commercial general liability policy to Curtis Management spanning from October 30, 2019, to October 30, 2020 ("CGL Policy"). (JSF ¶¶ 23–25, Ex. 6.) Continental also issued a miscellaneous professional liability policy to Curtis Management for August 15, 2019, to August 15, 2020 ("Professional Liability Policy"). (JSF ¶¶ 26–28, Ex. 7.)

The Windward HOA also held two policies. Travelers Property Casualty Company of America ("Travelers") issued a policy to the Windward HOA for May 5, 2019, to May 4, 2020 ("HOA Policy"). (JSF ¶ 31, Ex. 8.) Curtis Management is an additional insured under Travelers's HOA Policy. (JSF ¶ 32.) Plaintiff Great American also issued a commercial umbrella policy to the Windward HOA ("Umbrella Policy"). (JSF ¶¶ 34–37, Exs. 9–11.) Curtis Management is likewise an additional insured under Great American's Umbrella Policy. (JSF ¶ 38.)

## D.    Defense and Settlement

Travelers provided a defense against Lovato's lawsuit for the Windward HOA and its additional insured, Curtis Management, under the HOA Policy. (*See* JSF ¶¶ 31–32, 83.)

23cv1796

In January 2022—while the Underlying Litigation was well underway—Curtis Management submitted a claim under Continental's Professional Liability and CGL Policies. (JSF ¶ 39, Exs. 12–13.) In February 2022, Continental denied coverage under the Professional Liability Policy, which covers professional services claims but contains an exclusion for a bodily injury like the one alleged by Lovato. (JSF ¶ 42, Ex. 14.)

About a week later, Continental also declined coverage under its CGL Policy. (JSF ¶¶ 45–46, Ex. 16.) Unlike the Professional Liability Policy, this insurance covers bodily injury, but Continental stated it was denying coverage because the CGL Policy includes an exclusion for certain real estate activities. (JSF Ex. 16.) Continental did not explain why it believed the real estate exclusion applied or mention any evidence it was relying upon beyond Lovato's complaint. (*See id.*) Great American later asked Continental to reconsider its coverage position as the Underlying Litigation approached mediation. (JSF ¶¶ 51–52, Ex. 18.) Continental again declined coverage. (JSF ¶¶ 55–59.)

The Underlying Litigation settled for $2.75 million. (JSF ¶ 65.) Travelers contributed $1 million under the HOA Policy, and Great American paid $1.75 million under the Umbrella Policy. (JSF ¶¶ 67, 83.) It is undisputed that $2.75 million is "a reasonable settlement figure based on the injuries Mr. Lovato alleged he sustained." (JSF ¶ 81.) After the settlement, Great American again implored Continental to reconsider its coverage determination, but Continental remained steadfast. (JSF ¶¶ 70–72.)

### E.    Procedural History

In September 2023, Great American filed this diversity action against Continental. (Compl., ECF No. 1.) Great American alleges Continental wrongly denied coverage under the CGL Policy. (*Id.* ¶¶ 25–51.) Further, Great American claims Continental is "primarily liable" for the loss, whereas Great American "only provided coverage in excess of the Continental Policy." (*Id.* ¶ 78.) Great American thus alleges it is entitled to recover $1 million it paid toward the settlement that should have been first paid by Continental under its primary insurance policy. (*Id.* ¶¶ 7–9.)

23cv1796

Based on these allegations, Great American brings three claims.  First, it seeks a declaratory judgment that Continental was obligated to defend and indemnify Curtis Management under the CGL Policy, as well as a determination that the CGL Policy was on the hook before Great American's Umbrella Policy.  (Compl. ¶¶ 52–61.)  Second, Great American brings a claim for equitable subrogation.  (*Id.* ¶¶ 62–81.)  Third, Great American seeks relief on an equitable indemnity theory.  (*Id.* ¶¶ 82–85.)  The latter two claims seek an award of $1 million.  (*Id.* ¶¶ 81, 85.)  Each party now requests summary judgment in its favor.  (Great American's Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 35; Continental's Cross-Mot. for Summ. J. & Opp'n ("Def.'s Cross-Mot."), ECF No. 36.)  The Court heard oral argument.  (ECF No. 49.)

## II.   LEGAL STANDARD

Summary judgment is proper on "each claim or defense—or the part of each claim or defense"—when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it might affect the outcome of the suit under the governing law, and a dispute is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When resolving a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The court does not make credibility determinations or weigh conflicting evidence.  *See Anderson*, 477 U.S. at 255.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

## III.   ANALYSIS

Great American and Continental seek summary judgment on three overlapping claims: declaratory relief, equitable subrogation, and equitable indemnity.  Several principles frame the Court's analysis.  First, California law applies to this diversity dispute.

1   *See Encompass Ins. Co. v. Coast Nat'l Ins. Co.*, 764 F.3d 981, 984 (9th Cir. 2014); *see also*

2   *Frontier Oil Corp. v. RLI Ins. Co.*, 153 Cal. App. 4th 1436, 1461–62 (2007) (reasoning

3   California's choice of law rules point to the state's own law where the state is the intended

4   place of performance under the insurance policies).

5       Second, California's framework for interpreting insurance policies is well settled.

6   *Yahoo Inc. v. Nat'l Union Fire Ins. Co.*, 14 Cal. 5th 58, 67 (2022). Although "insurance

7   contracts have special features, they are still contracts to which the ordinary rules of

8   contractual interpretation apply." *Id.* (quoting *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109,

9   1115 (1999)). Hence, the parties' mutual intention "at the time the contract is formed

10  governs interpretation." *Id.* Where possible, the court will "infer this intent solely from

11  the written provisions of the insurance policy." *Id.* "If the policy language 'is clear and

12  explicit, it governs.'" *Id.* (quoting *Palmer*, 21 Cal. 4th at 1115).

13      "A policy provision will be considered ambiguous when it is capable of two or more

14  constructions, both of which are reasonable." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th

15  1, 18 (1995). If there is an ambiguity in the policy, the court "must first attempt to

16  determine whether coverage is consistent with the insured's objectively reasonable

17  expectations." *Bank of the W. v. Superior Ct.*, 2 Cal. 4th 1254, 1265 (1992). The reasonable

18  expectations inquiry "requires a consideration of the policy as a whole, the circumstances

19  of the case in which the claim arises and 'common sense.'" *St. Paul Fire & Marine Ins.*

20  *Co. v. Am. Dynasty Surplus Lines Ins. Co.*, 101 Cal. App. 4th 1038, 1058 (2002) (quoting

21  *Bank of the W.*, 2 Cal. 4th at 1265).

22      Third, this dispute touches upon the distinction between primary and excess

23  insurance. The distinction "is significant because '[d]ifferent rules govern the obligations

24  of excess and primary insurers.'" *Deere & Co. v. Allstate Ins. Co.*, 32 Cal. App. 5th 499,

25  506 (2019) (quoting *Forecast Homes, Inc. v. Steadfast Ins. Co.*, 181 Cal. App. 4th 1466,

26  1474 (2010)). Primary insurance is "the first layer of coverage, whereby 'liability

27  attaches immediately upon the happening of the occurrence that gives rise to liability.'"

28  *Truck Ins. Exch. v. Kaiser Cement & Gypsum Corp.*, 16 Cal. 5th 67, 79 (2024) (emphasis

omitted) (quoting *Montrose Chem. Corp. v. Superior Ct. of Los Angeles Cnty.*, 9 Cal. 5th 215, 222 (2020)).  The primary insurer typically has "the primary duty of defense." *Id.* at 79 (quoting *Olympic Ins. Co. v. Emps. Surplus Lines Ins. Co.*, 126 Cal. App. 3d 593, 597 (1981)).

In contrast, excess insurance "refers to indemnity coverage that attaches upon the exhaustion of underlying insurance coverage for a claim." *Truck Ins. Exch.*, 16 Cal. 5th at 67 (quoting *Montrose*, 9 Cal. 5th at 222).  The "excess insurer's coverage obligation begins once a certain level of loss or liability is reached." *Id.*  Further, the excess insurer's defense obligation starts only after the primary insurance is exhausted. *Forecast Homes, Inc.*, 181 Cal. App. 4th at 1474.  Umbrella policies are one type of excess insurance. *Powerine Oil Co. v. Superior Ct.*, 37 Cal. 4th 377, 398 n.9 (2005).

With these principles in mind, the Court first considers the parties' disagreement over Continental's duty to defend Curtis Management, as well as the relevance of this duty now that the Underlying Litigation has been resolved.

## A.     Duty to Defend

"[A] liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity." *Dua v. Stillwater Ins. Co.*, 91 Cal. App. 5th 127, 136 (2023) (alteration in original) (quoting *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1081 (1993)).  An insurer "must defend a suit which *potentially* seeks damages within the coverage of the policy." *Horace Mann*, 4 Cal. 4th at 1081.  Hence, the "insurer must defend against a suit even 'where the evidence suggests, but does not conclusively establish, that the loss is not covered.'" *Hartford Cas. Ins. Co. v. Swift Distrib., Inc.*, 59 Cal. 4th 277, 287 (2014) (quoting *Montrose Chem. Corp. v. Superior Ct.*, 6 Cal. 4th 287, 299 (1993)).

"Unlike the obligation to indemnify, which is only determined when the insured's underlying liability is established, the duty to defend must be assessed at the very outset of a case." *Gordon v. Cont'l Cas. Co.*, 107 Cal. App. 5th 89, 100 (2024) (quoting *Hartford*, 59 Cal. 4th at 287).  This assessment is made "by comparing the allegations of the

complaint with the terms of the policy." *Horace Mann*, 4 Cal. 4th at 1081. Extrinsic facts beyond the complaint may also give rise to the duty to defend or allow the insurer to decline to defend where those facts eliminate the potential for coverage. *See id.*; *Waller*, 11 Cal. 4th at 19. "The duty to defend arises under the facts alleged, and any doubts are resolved in favor of the insured." *Dua*, 91 Cal. App. 5th at 137 (citing *Hartford*, 59 Cal. 4th at 287).

Moreover, where multiple insurers have a duty to defend, "each insurer's duty is 'separate and independent from the others[.]'" *Risely v. Interinsurance Exch. of the Auto. Club*, 183 Cal. App. 4th 196, 210 (2010) (quoting *Aerojet-Gen. Corp. v. Transp. Indem. Co.*, 17 Cal. 4th 38, 70 (1997)). If an insurer "owes any defense burden it must be fully borne, with allocations of that burden among other responsible parties to be determined later." *Haskel, Inc. v. Superior Ct.*, 33 Cal. App. 4th 963, 976 n.9 (1995) (citation omitted) (citing *Horace Mann*, 4 Cal. 4th at 1084).

### 1.    Applicability

Before the Court assesses the duty to defend, Continental raises a threshold argument. Continental contends the duty to defend is not applicable because Travelers defended Curtis Management in the Underlying Litigation. (Def.'s Cross-Mot. 23:22–24:13.) Thus, Continental argues Great American was not responsible for any defense costs in the Underlying Litigation, and Great American cannot recover those costs on behalf of its insured. (*Id.* 24:10–13.)

Continental's argument misses the mark. Great American is seeking a determination that Continental wrongly refused to defend its insured because that conclusion would shift the burden in this case. Normally, in a dispute between insurers over liability for a loss, the burden is on the party claiming coverage to show that coverage existed under the other insurer's policy. *See St. Paul Mercury Ins. Co. v. Mountain W. Farm Bureau Mut. Ins. Co.*, 210 Cal. App. 4th 645, 654 (2012). "However, the burdens and proof are altered somewhat when one insurer with a defense duty does not join in the defense of the underlying action." *Id.* When a settling insurer seeks recovery from "a nonparticipating insurer, the settling insurer has met its burden of proof when it makes a prima facie showing

of potential coverage under the nonparticipating insurer's policy." *Axis Surplus Ins. Co. v. Glencoe Ins. Ltd.*, 204 Cal. App. 4th 1214, 1223 (2012); *see also Safeco Ins. Co. of Am. v. Superior Ct.*, 140 Cal. App. 4th 874, 880 (2006) ("When a duty to defend is shown, nonparticipating coinsurers are presumptively liable for both the costs of defense and settlement."). "After the settling insurer has satisfied its burden of proof, the burden shifts to the nonparticipating insurer to prove an absence of actual coverage under its policy." *Axis Surplus*, 204 Cal. App. 4th at 1223. Hence, the Court is unpersuaded by Continental's contention that the duty to defend is irrelevant in this subrogation action.

### 2.    Potential for Coverage

The Court must interpret the CGL Policy to determine whether it potentially covered the Underlying Litigation and triggered Continental's duty to defend. "The first issue is whether the claim falls within the scope of the basic coverage of the policy defined in the insuring clause." *Am. Star Ins. Co. v. Ins. Co. of the W.*, 232 Cal. App. 3d 1320, 1325 (1991) (citation omitted).

Continental's CGL Policy combines several insurance forms to provide different types of liability coverage. (CGL Policy at CCC_000009.) This dispute focuses on the $1,000,000 "liability and medical expense limit," which corresponds to the "Businessowners Liability Coverage Form." (*Id.*) Thus, when the Court references the CGL Policy's text, it is referring to this coverage form.

The CGL Policy's insuring clause is typical. Section A provides Continental "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury,' 'property damage' or 'personal and advertising injury' to which this insurance applies." (CGL Policy § A.1.a.) Continental has the "right and duty to defend the insured against any 'suit' seeking those damages." (*Id.*) That said, a "bodily injury" is covered only if it "is caused by an 'occurrence'" and "occurs during the policy period." (*Id.*)

The gateway question, then, is whether Lovato's lawsuit against Curtis Management falls under Section A of the CGL Policy. The parties simplify this inquiry by making

several stipulations.  Lovato's injury indisputably constitutes a "bodily injury" as defined in the CGL Policy.  (JSF ¶ 75.)  Further, the bodily injury was caused by an "occurrence" and "took place during the Continental CGL Policy Period."  (*Id.* ¶¶ 76–77.)  Given these stipulations, the claims raised in the Underlying Litigation are "within the scope of the basic coverage of the policy defined in the insuring clause."  *See Am. Star Ins. Co.*, 232 Cal. App. 3d at 1325.  As such, the Court must consider whether a policy exclusion made it clear there was no possibility of coverage, which would relieve Continental of its duty to defend under Section A.  *See id.* at 1325–26.

### 3.    Exclusions to Coverage

Section B of the CGL Policy lists the exclusions to coverage, and several endorsements modify this list.  "A conspicuous, unambiguous applicable exclusion will override the insuring clause and eliminate coverage the policy might otherwise afford."  *Murphy v. AAA Auto Ins. of S. Cal.*, 108 Cal. App. 5th 476, 482 (2025) (quoting *Am. Star Ins. Co.*, 232 Cal. App. 3d at 1325).   In other words, exclusionary clauses must be conspicuous, plain, and clear.  *Id.*  Moreover, where an insurer seeks to defeat potential coverage by relying on an exclusion, the insurer must provide "conclusive evidence demonstrating that the exclusion applies."  *Pulte Home Corp. v. Am. Safety Indem. Co.*, 14 Cal. App. 5th 1086, 1116 (2017) (quoting *Atl. Mut. Ins. Co. v. J. Lamb, Inc.*, 100 Cal. App. 4th 1017, 1038–39 (2002)).

To attempt to show there was no possibility of coverage, Continental points to an endorsement titled Limitation of Coverage – Real Estate Services ("Real Estate Services Limitation").  (Def.'s Cross-Mot. 11:3–14:11.)  The Real Estate Services Limitation adds an exclusion for rental property and ties into the Policy's existing exclusion for professional services.  Continental invokes both these carveouts to coverage.  (*Id.*)

### i.    Rental Premises Exclusion

The Real Estate Services Limitation first adds an exclusion that the Court labels the "Rental Premises Exclusion."  This exclusion eliminates coverage as follows:

This insurance does not apply to "bodily injury," "property damage," or "personal and advertising injury" arising out of the ownership, operation, maintenance or use of premises held for rental, if:

1.    You operate, manage or rent the premises for others, or;

2.    You act as an agent for the collection of rents in any supervisory capacity for others, or;

3.    [sic] Act as a property manager for others.

(Real Estate Services Limitation, CGL Policy at CCC_000111.)

Continental argues the Rental Premises Exclusion applies because its insured managed the Windward HOA's premises, those premises are "held for rental," and Lovato's bodily injury "arose from the Windward Premises." (Def.'s Cross-Mot. 11:14–15.)  Great American contends this interpretation is incorrect because the Windward HOA's "property is not a 'premises held for rental,' and Curtis was not managing rental units" for the Windward HOA.  (Pl.'s Reply 9:1–2, ECF No. 40.)

In considering these arguments, the Court recognizes that there is now a sharper image of the facts, including that Lovato was a tenant in a unit, and Lovato was renting that unit from an individual landlord.  (JSF ¶¶ 8–15.)  The law is clear, however, that Continental's "duty to defend is not measured by hindsight." *See We Do Graphics, Inc. v. Mercury Cas. Co.*, 124 Cal. App. 4th 131, 136 (2004).  If Continental's refusal to defend was based on inadequate information, it cannot now cure that error by pointing to other facts existing at the time of its refusal that could have vindicated its decision. *See id.*; *see also*, *e.g.*, *Mullen v. Glens Falls Ins. Co.*, 73 Cal. App. 3d 163, 173 (1977) (reasoning an insurer cannot "refuse to defend its insured on the slightest provocation and then resort to hindsight for the justification").  Thus, the Court must consider what information Continental relied on when it refused to defend Curtis Management in early 2022.

Lovato's Allegations.  The Court first turns to the complaint in the Underlying Litigation.  In the first cause of action for general negligence, Lovato alleges the defendants, including Curtis Management,

- 11 -

1
2
3

were in possession of and owned, operated, supervised, designed, constructed, maintained, repaired, and controlled those certain business premises located at 855 Harbor Cliff Way, Oceanside, CA 92054, in the City of Oceanside, County of San Diego, State of California ("subject location").

4
5
6
7
8
9

On or about December 22, 2019, [Lovato] was an invitee upon said business premises wherein he tripped and fell on a dangerous single step located in a common area walkway near the clubhouse at the subject location.  Defendants . . . carelessly and negligently owned, operated, maintained, constructed, designed, set-up, inspected, repaired, controlled, staffed, supervised, promoted and advertised said premises, which was in a dangerous, defective and unsafe condition.

10

(Lovato's Compl. 5.)

11
12
13
14
15

Given these allegations, the Court is unpersuaded that the Rental Premises Exclusion unambiguously eliminated the possibility for coverage in 2022.  Lovato's negligence claim does not specify Curtis Management's role or describe its conduct that contributed to the injury.  (*See id.*)  The second cause of action for premises liability does not shed any more light on the accident.  (*See id.* 6.)

16
17
18
19
20
21
22

Further, Lovato alleges he was an "invitee" of the "business premises" owned or operated by the defendants.  (Lovato's Compl. 5.)  He does not allege those "business premises" were held for rental.  (*See id.*)  Continental's duty to defend "arises under the facts alleged, and any doubts are resolved in favor of the insured."  *See Dua*, 91 Cal. App. 5th at 137.  Thus, Lovato's suit claiming a bodily injury due to Curtis Management's negligence is one that "*potentially* seeks damages within the coverage of the policy."  *See Horace Mann*, 4 Cal. 4th at 1081.

23
24
25
26
27

<u>Extrinsic Facts</u>.  Although the duty to defend is usually assessed at the outset of a case, Curtis Management did not tender its claim under the CGL Policy until over a year after the Underlying Litigation commenced.  (*See* JSF ¶¶ 1, 39.)  *See Gordon*, 107 Cal. App. 5th at 100.  Therefore, the Court considers whether Continental relied on "extrinsic facts" that eliminated the possibility of coverage, which would justify Continental's refusal

28

23cv1796

to defend "even when the bare allegations in the complaint suggest potential liability." *See Waller*, 11 Cal. 4th at 19.

Continental's letter declining coverage is of no help on this point. It summarizes Lovato's allegations and quotes the Real Estate Services Limitation. (*See* JSF Ex. 16.) But the letter does not mention any extrinsic information the insurer relied upon to find the exclusion conclusively applied to Lovato's claims. (*See id.*)

Even so, Continental takes the position that it invoked the Real Estate Services Limitation because Lovato was a tenant of a unit at the Windward Community. Continental does not substantiate this claim under the summary judgment standard. *See* Fed. R. Civ. P. 56(c)(1)(A). Indeed, at oral argument, the Court pressed Continental to identify any extrinsic evidence the insurer relied upon. (ECF No. 49.) Continental could not point to anything in the record that clearly establishes the insurer's knowledge at the time the denial was issued. (*Id.*)

Great American also introduces evidence that disproves Continental's allegation. (Pl.'s Mot. 4:4–20.) Great American points to deposition testimony from the Continental employee who directed the denial of Curtis Management's claim:

> Q.    Okay. Did you know at that point in time what part of the property was held for rental such that you were applying this exclusion to it?
>
> A.    No.
>
> Q.    Okay. But you assume that some property was held for rental?
>
> A.    Yes.

(Roy Dep. 66:1–12, Vogrin Decl. Ex. B, ECF No. 35-6; *see also id.* 66:21–67:4 (testifying that he "was not aware what part of the property was being held for rental when" Continental issued the coverage denial).)

In other words, the only evidence before the Court demonstrates Continental made its coverage determination based on an assumption that there must be at least some rental property at the community. Such an assumption is not "conclusive evidence demonstrating

that the exclusion applies." *See Pulte Home Corp.*, 14 Cal. App. 5th at 1116.[1]  It follows that Continental fails to meet its burden to show Lovato's complaint or extrinsic information eliminated any possibility of coverage.  Thus, Continental's reliance on the Rental Premises Exclusion in 2022 does not survive scrutiny.  *See id.*; *see also Waller*, 11 Cal. 4th at 16 (noting the insurer has the burden to prove an exclusion).

## ii.    Professional Services Exclusion

The CGL Policy excludes coverage for a bodily injury "caused by the rendering or failure to render any professional service." (CGL Policy § B.1.j.)  The policy provides thirteen examples of professional services, and Continental highlights two here. (*Id.*)  First, the standard form includes "(3) Supervisory, inspection, or engineering services." (CGL Policy § B.1.j.(3).)  Second, the Real Estate Services Limitation amends that form to add:

> 13.    "Real estate services."
>
> . . . .
>
> "Real Estate Services" means services that require special skill, special knowledge, special training, or special judgment, of a real estate agent, real estate broker, real estate personal assistant, or real estate consultant.

These examples are only illustrative, however.  It bears repeating that the Policy is worded to exclude a bodily injury claim caused by "*any* professional service." (*See id.* (emphasis added).)

Although the policy language varies, there is an abundance of caselaw interpreting "professional services" exclusions.  Typically, "CGL policies are limited to providing coverage for accidental occurrences, and do not provide coverage for professional negligence claims." *Tradewinds Escrow, Inc. v. Truck Ins. Exch.*, 97 Cal. App. 4th 704,

---

[1] It is possible that Continental had access to additional information about Lovato's claims when it refused to defend Curtis Management. (*See* JSF Ex. 15.)  It would be improper, however, to assume Continental reviewed or relied upon that information without the insurer submitting proof to support that fact. *See* Fed. R. Civ. P. 56(c)(1)(A); *cf. Atl. Mut. Ins. Co.*, 100 Cal. App. 4th at 1038–39 (discussing a claims adjuster's declaration, which provided that the insurer learned of an extrinsic fact from a representative of the insured).  And as mentioned, the undisputed evidence only supports the opposite conclusion. (*See* Roy Dep. 66:1–12, 66:21–67:4.)

713 (2002).    Thus, CGL policies "often contain exclusions for loss resulting from the rendering of or failure to render professional services." *Id.*

Courts define "'professional services' as those 'arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual.'" *Energy Ins. Mut. Ltd. v. Ace Am. Ins. Co.*, 14 Cal. App. 5th 281, 292 (2017) (quoting *Tradewinds*, 97 Cal. App. 4th at 713).    The definition "encompasses a broad range of activities beyond those traditionally considered 'professions,' such as medicine, law, or engineering." *Hollingsworth v. Com. Union Ins. Co.*, 208 Cal. App. 3d 800, 806 (1989).

One California decision reasoned "numerous circumstances fall within the exclusion for professional services under a CGL policy, with the unifying factor being whether the injury occurred during the performance of the professional services, not the instrumentality of injury." *Tradewinds*, 97 Cal. App. 4th at 713.    However, the California Court of Appeal has also reasoned the injury must arise from the insured's "performance of a professional service, not merely at the same time the insured was otherwise providing professional services to a third party."    *Food Pro Int'l, Inc. v. Farmers Ins. Exch.*, 169 Cal. App. 4th 976, 991 (2008); *see also* Hon. H. Walter Croskey (Ret.), *et al.*, California Practice Guide: Insurance Litigation ¶ 7:330.2 (Rutter Group Aug. 2024) (discussing the professional services exclusion and limitations).    To illustrate:

- An employee of a cosmetics business negligently pierced a minor customer's ears, resulting in serious injury and disfigurement.    In this context, ear piercing "clearly constitute[d] a professional service," and the exclusion applied because it eliminated coverage for bodily injury "due to the providing of . . . any professional service." *Hollingsworth*, 208 Cal. App. 3d at 804, 808.

- An excavator struck a petroleum pipeline and caused catastrophic injuries.    The gravamen of the underlying claims was that the insureds' trained inspectors "failed to mark the pipeline, the very thing they were required to perform at the site."    Because the mapping and marking of underground installations is a

- 15 -

professional service and the claims arose from that service, the exclusion applied. *Energy Ins.*, 14 Cal. App. 5th at 285, 292–99.

- A worker was severely injured after he fell through a hole at a food processing plant. The insured had been hired to provide engineering services, including construction and equipment installation management, and was on site when the accident happened. The complaint "alleged general negligence and premises liability," but did not "allege misconduct relating to the adequacy of [the insured's] performance of professional services to its client." Hence, the insurer had a duty to defend the claim notwithstanding the exclusion. *Food Pro*, 169 Cal. App. 4th at 990.

Continental argues the Professional Services Exclusion applies because Lovato alleged the Windward HOA and Curtis Management failed to properly "inspect and supervise at the premises." (Def.'s Cross-Mot. 13:17–29.) The insurer also cites the Association Management Agreement to prove Curtis Management was providing "professional services." (*Id.*)

Continental's argument is unavailing. To assess the duty to defend, the Court must consider whether it was clear in 2022 that Lovato's "bodily injury" was "*caused* by the rendering or failure to render any professional service." (CGL Policy § B.1.j.(3) (emphasis added).) Lovato's complaint is once again the starting point. As excerpted above, Lovato's allegations are broad and nonspecific. Lovato alleges that the Windward HOA and Curtis Management not only negligently failed to inspect or supervise at the property, but also "negligently owned, operated, maintained, constructed, designed, set-up, . . . repaired, [and] controlled . . . said premises, which was in a dangerous, defective, and unsafe condition." (*Id.*) These generalized allegations plainly target the Windward HOA and Curtis Management's duty of care owed to the community's residents.[2]

---

[2] "[T]raditional tort principles impose on landlords, no less than on homeowner associations that function as a landlord in maintaining the common areas of a large condominium complex, a duty to exercise due care for the residents' safety in those areas under their control." *Frances T. v. Vill. Green*

Lovato further claims he tripped and fell on "a dangerous single step" located in a common area walkway, but his Complaint does not provide any other details about the incident. (Lovato's Compl. 5.) For example, was the step poorly designed? Was there inadequate lighting? Did Curtis Management fail to change a light bulb or program the exterior lighting to turn on at dusk? Did the Windward HOA fail to install a handrail or a "Watch Your Step" sign? Was there high-contrast paint on the step that was inadequately maintained? Did an irrigation leak make the step slippery? The complaint does not allege—or rule out—any of these possibilities. Some of these causes might arise from Curtis Management's professional services or lack thereof; others might not.

Accordingly, Lovato's allegations do not demonstrate his injury was "caused by the rendering or failure to render any professional service" on the part of the insured. (CGL Policy § B.1.j.(3).) Instead, the injury may have occurred "merely at the same time the insured was otherwise providing professional services to" the Windward HOA. *See Food Pro*, 169 Cal. App. 4th at 991; *see also* Croskey et al., *supra*, at ¶ 7:330.5 ("If the insured's liability could be based on acts of general negligence, there may be coverage under a CGL policy."). And this case is distinguishable from those decisions where the professional service was obviously the cause of the injury, such as where the injuries occurred "as a result of the insureds' failure to properly mark the pipeline—the very thing they were supposed to perform," *see Energy Ins.*, 14 Cal. App. 5th at 296, or where there was no dispute the minor customer suffered "serious injury and disfigurement" from an ear piercing service conducted by the insured's employee, *see Hollingsworth*, 208 Cal. App. 3d at 803.

---

*Owners Ass'n*, 42 Cal. 3d 490, 499 (1986). Hence, HOAs and their managers may be found negligent if they knew or should have known about a dangerous condition under their control that harms a resident. *See id.* at 499–511; *cf. Chee v. Amanda Goldt Prop. Mgmt.*, 143 Cal. App. 4th 1360, 1378 (2006) (affirming finding that property manager's duty of care "was no different than that of the landlord" where third party brought unsuccessful negligence claim concerning a tenant's dangerous dog). Lovato's premises liability claim is likewise "a form of negligence." *See Leyva v. Garcia*, 20 Cal. App. 5th 1095, 1103 (2018) (citing *Brooks v. Eugene Burger Mgmt. Corp.*, 215 Cal. App. 3d 1611, 1619 (1989)).

23cv1796

Nor does Continental's reliance on the Association Management Agreement justify the insurer's refusal to defend.  To start, Continental did not mention the agreement in its denial letter, and the insurer does not show it relied on the contract's terms to invoke the exclusion in 2022.  Regardless, the agreement does not conclusively show the injury was caused by professional services.  Many of the duties Curtis Management agreed to undertake involved specialized knowledge, labor, or skill, but Curtis Management also had the authority to make emergency repairs to common areas, and Curtis Management agreed to broadly perform "other duties as are generally within the responsibility of an association management Agent."  (Ass'n Mgmt. Agmt. §§ F.5, G.4.)  Further, as the caselaw explains, the analysis does not stop at the words of an agreement but extends to whether the injury arose from those services.  *See Food Pro*, 169 Cal. App. 4th at 991; *see also Atain Specialty Ins. Co. v. 20 Parkridge, LLC*, No. 15-cv-00212-MEJ, 2015 WL 2226356, at *10 (N.D. Cal. May 11, 2015) (applying California law and reasoning the court's determination "requires a greater understanding of the services Defendants provided, the actual injuries claimed in the Underlying Action, and the timing that Defendants may have rendered or failed to render the potential professional services").

Moreover, Plaintiff directs the Court to *Great American Insurance Co. v. Sequoia Insurance Co.*, No. SA CV 15-1161-DOC (Ex), 2016 WL 844819 (C.D. Cal. Mar. 1, 2016), which involved nearly identical circumstances.  In *Sequoia*, like here, a plaintiff filed negligence and premises liability claims against an HOA and its managers for injuries he sustained in a common area—the community's pool.  *Id.* at *1.  The complaint broadly alleged the defendants "unlawfully owned, . . . managed, and maintained said premises in a dangerous and defective condition."  *Id.* at *2.  The plaintiff claimed that there was a lack of adequate signage and lighting in the pool area.  *Id.*  Also like here, the relevant community manager's insurer refused to defend the claims and cited a professional services exclusion.  *Id.* at *3.

The Central District found the insurer wrongfully refused to defend the lawsuit.  The court reasoned the allegations in the underlying lawsuit were too general to preclude

coverage, as some of the manager's conduct connected to the accident may have not involved "specialized knowledge, labor, or skill" that was "predominantly mental or intellectual." *Id.* at *7. "For example, the alleged acts or omissions concerning the programming of the pool area lighting may not have arisen from the provision of professional services." *Id.*; *cf. Pa. Nat'l Mut. Cas. Ins. Co. v. Roberts Bros.*, 550 F. Supp. 2d 1295, 1306 (S.D. Ala. 2008) ("Under no ordinary common-sense meaning of the term is it a 'professional service' for a property manager to perform (or fail to perform) the strictly clerical task of picking up the telephone to call a handyman to repair a broken door. This omission forms the sole basis of the claims against [the property manager] in the underlying lawsuit."). The same reasoning applies here. There simply was not enough information for Continental to conclude there was no possibility of coverage.

Overall, Continental fails to show it had "conclusive evidence demonstrating that the exclusion applies." *See Pulte Home Corp.*, 14 Cal. App. 5th at 1116. Therefore, its refusal to defend Curtis Management in light of the Professional Services Exclusion does not withstand scrutiny.

### iii.    Other Insurance Provision

The Court next considers Continental's argument that it did not have a duty to defend Curtis Management in light of the CGL Policy's Other Insurance Provision. (Def.'s Cross-Mot. 14:15–15:7; Oral Argument.) Great American counters that Continental waived this argument, so the Court first resolves that threshold issue.

### a.    Waiver

"Case law is clear that 'waiver is the intentional relinquishment of a known right after knowledge of the facts.' The burden is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and 'doubtful cases will be decided against a waiver.'" *Waller*, 11 Cal. 4th at 31 (citation modified) (quoting *City of Ukiah v. Fones*, 64 Cal. 2d 104, 107–08 (1966)). The general rule is that a "waiver requires the insurer to intentionally relinquish its right to deny coverage and that a denial of coverage on one ground does not, absent clear and convincing

evidence to suggest otherwise, impliedly waive grounds not stated in the denial." *Id.* (quoting *State Farm Fire & Cas. Co. v. Jioras*, 24 Cal. App. 4th 1619, 1628 n.7 (1994)).

Great American does not meet its burden to show Continental waived its rights under the CGL Policy's Other Insurance Provision.  Great American highlights that "Continental did not set out in its denial letter that its reason for declining to defend was because it was excess to Travelers by way of the 'Other Insurance' clause."  (Pl.'s Reply 14:17–19; *see also* Pl.'s Mot. 14:3–15:3 (raising waiver preemptively).)  Rather, Continental's denial letter relies on the exclusions analyzed above.

Even so, Continental's omission is not enough to find waiver.  *See Waller*, 11 Cal. 4th at 33 ("A holding that an insurer waives defenses not asserted in its initial denial of a duty to defend would be inconsistent with established waiver principles by erroneously implying an intent to relinquish contract rights where no such intent existed.").  In addition, Continental's letter states the insurer "reserves the right to rely upon all of the policy's provisions, whether or not specifically quoted and/or paraphrased in this letter."  (JSF Ex. 15.)  Great American thus does not raise a triable issue of fact as to whether Continental waived its right to rely on the Other Insurance Provision in the CGL Policy, and the Court rejects the waiver claim.  *See, e.g.*, *Santa Clara Valley Water Dist. v. Century Indem. Co.*, 89 Cal. App. 5th 1016, 1056 (2023) (explaining waiver could not be based on insurer's "failure to specifically mention" policy conditions in a letter).

### b.    Enforceability

Returning to Continental's argument, the insurer invokes the CGL Policy's Other Insurance Provision, which provides: "If you have other insurance covering the same loss or damage, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not."  (CGL Policy at CCC_000102.)  The Other Insurance Provision also states the coverage "is excess over . . . [a]ny other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured."  (*Id.*)  Finally, the Other Insurance Provision seeks to roll back the insurer's duty to defend:

- 20 -

> When this insurance is excess, we will have no duty under Business Liability Coverage to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so; but we will be entitled to the insured's rights against all those other insurers.

(*Id.*)

Most insurance policies—"and virtually *all* liability policies—contain 'other insurance' clauses that limit an insurer's liability to the extent that other insurance may cover the same loss." Croskey et al., *supra*, at ¶ 8:10. Hence, these provisions frequently arise in disputes between insurers. As the California Supreme Court summarized:

> Historically, "other insurance" clauses were designed to prevent multiple recoveries when more than one policy provided coverage for a particular loss. On the other hand, "other insurance" clauses that attempt to shift the burden away from one primary insurer wholly or largely to other insurers have been the objects of judicial distrust. "[P]ublic policy disfavors 'escape' clauses, whereby coverage purports to evaporate in the presence of other insurance. This disfavor should also apply, to a lesser extent, to excess-only clauses, by which carriers seek exculpation whenever the loss falls within another carrier's policy limit." Partly for this reason, the modern trend is to require equitable contributions on a pro rata basis from all primary insurers regardless of the type of "other insurance" clause in their policies.

*Dart Indus., Inc. v. Com. Union Ins. Co.*, 28 Cal. 4th 1059, 1079–80 (2002) (citations omitted) (quoting *CSE Ins. Grp. v. Northbrook Prop. & Cas. Co.*, 23 Cal. App. 4th 1839, 1845 (1994); and *Fireman's Fund Ins. Co. v. Md. Cas. Co.*, 65 Cal. App. 4th 1279, 1305 (1998)).

Courts have encountered clauses that are analogous to the one invoked by Continental. For example, in *Certain Underwriters at Lloyds, London v. Arch Specialty Insurance Co.*, an insurer refused to provide a defense under its CGL policy. 246 Cal. App. 4th 418, 424 (2016). The insurer relied on the policy's several "other insurance" provisions, which not only provided the policy was excess to other primary insurance, but also stated the insurer would "have no duty . . . to defend any claim or suit that any other insurer has a duty to defend." *Id.* at 425–26. The California Court of Appeal held the insurer had a duty to defend despite the "other insurance" provisions. *Id.* at 429. It

reasoned the provisions did not transform the insurer's primary insurance policy into a truly excess policy. *Id.* at 429–31. Further, the "other insurance" provisions operated as an escape clause because, among other reasons, they "purported to extinguish" the policy's defense "obligation when other insurance afforded a defense." *Id.* at 434.

Similarly, in *USF Insurance Co. v. Clarendon American Insurance Co.*, the district court refused to enforce a provision providing the "duty to defend is excess over and shall not contribute where the insured has any other insurance under which, but for the existence of this Policy, any other insurer is obligated to provide a defense." 452 F. Supp. 2d 972, 999 (C.D. Cal. 2006) (emphasis omitted). The court reasoned this provision functioned as "a type of 'escape clause'—albeit a narrower one than an excess insurance clause—since it allows a primary insurer 'to make a seemingly ironclad guarantee' that it will defend the insured, 'only to withdraw that [guarantee] . . . in the presence of other insurance.'" *Id.* at 1001 (alterations in original) (quoting *Century Sur. Co. v. United Pac. Ins. Co.*, 109 Cal. App. 4th 1246, 1256 (2003)). Further, that conclusion was appropriate because "so far as the insured is concerned, the duty to defend may be as important as the duty to indemnify." *Id.* (quoting *Buss v. Superior Ct.*, 16 Cal. 4th 35, 45 (1997)). The court underscored:

> It is just as inequitable to permit an insurer to escape its bargained-for obligation to provide this type of protection to the insured as it is to permit the insurer to avoid its obligation to indemnify against an ultimate loss. An excess defense clause is also inequitable from the standpoint of other insurers who have undertaken to defend the insured. Like excess insurance provisions, excess defense clauses essentially "attempt to shift the burden away from one primary insurer wholly or largely to other insurers,' and must thus 'be[ ] the objects of judicial distrust.'"

*Id.* at 1002 (quoting *Dart Indus.*, 28 Cal. 4th at 1079–80).

By comparison, in *Hartford Casualty Insurance Co. v. Travelers Indemnity Co.*, an office building lease required the tenant to name the landlord as an additional insured under the tenant's liability policy. 110 Cal. App. 4th 710, 714 (2003). Consistent with that requirement, the landlord's policy declared it was "'excess' over other 'Insurance . . . if [the landlord was] added as an additional insured under any other policy.'" *Id.* at 714–15.

- 22 -

After an underlying action was settled, the landlord's and tenant's insurers brought competing equitable contribution claims. *Id.* at 715. The trial court enforced the excess-only clause in the landlord's policy. *Id.* The Court of Appeal affirmed. *Id.* at 728. It observed that there were "no broad 'excess only' clauses in either policy that purport to make the coverage excess whenever there is other insurance." *Id.* at 726. Further, enforcing the landlord's excess-only clause was appropriate because the competing policies "declare themselves to be excess in the situation where the parties and the insurers are most likely to intend that result—when the insured is covered as an additional insured on another party's policy for some specific event or situation." *Id.* at 726. Finally, the policies' "other insurance" clauses did not conflict. *Id.* at 727.

Against this backdrop, Continental does not meet its burden to show the Other Insurance Provision would have justified its refusal to defend Curtis Management. Continental argues *Hartford*'s reasoning should apply here (Def.'s Cross-Mot. 14:23–28), but the Court is unpersuaded. *Hartford* is distinguishable because in that case "there was no refusal to defend, nor was there a settlement made without the insurer's participation." 110 Cal. App. 4th at 722. Rather, both insurers acknowledged their defense obligations and participated in the settlement while reserving the right to seek contribution from each other. *Id.* at 713, 722. The Court of Appeal thus reasoned the burden-shifting presumption used in duty to defend cases was "not needed." *See id.* at 722 ("The battle is between two insurers who participated in the underlying action and who do not dispute the fact of [the insured's] liability or the amount thereof."). Here, unlike *Hartford*, Continental refused to defend Curtis Management and did not participate in the Underlying Litigation or the settlement.

Continental's reliance on *Hartford* also ignores that the CGL Policy does contain a "broad 'excess only' clause[] . . . that purport[s] to make the coverage excess whenever there is other insurance." *See id.* at 726. Here, that clause is the first section of "H. Other Insurance" in the CGL Policy. (*See* Other Insurance Provision ("If you have other insurance . . . we will pay *only* for the amount of covered loss or damage *in excess* of the

- 23 -

23cv1796

amount due from that other insurance[.]") (emphasis added).)  Thus, for this reason, too, *Hartford* is inapposite.[3]

Further, despite Continental's assertions, the CGL Policy is indisputably a primary policy.  It provides coverage that attaches immediately upon occurrence of a covered loss and "fails to display the indicia of a true excess or umbrella policy, such as much briefer length or specific identification of the primary coverage policy or other policy language." *See Com. & Indus. Ins. Co. v. Chubb Custom Ins. Co.*, 75 Cal. App. 4th 739, 746 (1999); *see also Century Sur. Co.*, 109 Cal. App. 4th at 1256 ("Whatever may be said about the merits of [the insurer's] attempt to limit its liability to 'excess' coverage, it is clear that it was not, and it cannot claim to be, a true excess or secondary insurer as we have described that term.").  And because "the 'other insurance' clause in [Continental's] policy is written into an otherwise primary policy," it is akin to other clauses that have been found to operate as disfavored escape clauses.  *See Edmondson Prop. Mgmt. v. Kwock*, 156 Cal. App. 4th 197, 203 (2007).

Indeed, despite the fact that the CGL Policy's insuring clause provides that Continental will defend covered claims, the Other Insurance Provision purports "to extinguish that obligation when other insurance afforded a defense."  *See Arch Specialty Ins. Co.*, 246 Cal. App. 4th at 434.  To interpret the CGL Policy as Continental desires would allow the insurer "to walk away from its primary coverage obligation on the basis of an excess 'other insurance' clause buried in a general liability policy."  *See Fed. Ins. Co. v. Lexington Ins. Co.*, No. EDCV 11-00895 VAP (OPx), 2011 WL 13225078, at *5 (C.D.

---

[3] Although the *Hartford* decision grounded its conclusion in the language of the two insurance policies, the Court of Appeal also incorporated the terms of the underlying commercial lease "to highlight the intent of the parties." 110 Cal. App. 4th at 728; *see also id.* at 723 & n.8.  The *Hartford* lease required the tenant to endorse its insurance policy to provide its insurance was "primary with respect to [the] Landlord and that any other insurance maintained by Landlord is excess and noncontributing with such insurance."  *Id.* at 723 n.8.  Unlike that lease, the Association Management Agreement only requires the HOA to name Curtis Management as an additional insured "if permitted by the insurance carrier," and the underlying contract does not provide Curtis Management's insurance will be excess to the HOA's policy. (Ass'n Mgmt. Agmt. § I.2.)  This difference further distinguishes *Hartford*.

- 24 -

Cal. Aug. 16, 2011); *accord USF Ins. Co.*, 452 F. Supp. 2d at 1000–01; *see also Arch Specialty Ins. Co.*, 246 Cal. App. 4th at 434.

In addition, although *Hartford* and other decisions have considered whether the two primary policies contain conflicting "other insurance" provisions, here Continental does not discuss Travelers's HOA Policy "other insurance" clause. (*See* Def.'s Cross-Mot. 14:12–15:7; *see also* Def.'s Reply 7:17–18.) *See Hartford*, 110 Cal. App. 4th at 727; *but see Edmondson Prop. Mgmt.*, 156 Cal. App. 4th at 203 (noting although one policy had an "other insurance" clause and the other policy did not, the modern trend is to require contribution "regardless of 'other insurance' language").[4]  Nor is it clear whether Continental was aware of the terms of Travelers's HOA Policy when it denied coverage, which would have been required for Continental to show there was "other primary insurance available to [Curtis Management] covering liability for damages arising out of the premises." (*See* Other Insurance Provision.)

Finally, Continental overlooks that any limitations on the insurer's duty to defend must be conspicuous. *See Md. Cas. Co. v. Nationwide Ins. Co.*, 65 Cal. App. 4th 21, 30 (1998). This requirement "refers to how a coverage-limiting provision actually has been positioned and printed within the policy at issue." *Haynes v. Farmers Ins. Exch.*, 32 Cal. 4th 1198, 1209 (2004). "[A]ny such limitation must be placed and printed so that it will attract the reader's attention." *Id.* at 1204. The CGL Policy's limitation on the duty to defend does not meet this requirement. It is found in a separate set of form conditions— far apart from the insuring clause it modifies—and the limitation is nestled within an excess-only other insurance section. (*See* Other Insurance Provision.) *See USF Ins.*, 452 F. Supp. 2d at 996–97 (reasoning limitation on duty to defend was inconspicuous where it

---

[4] The Court notes that Travelers's HOA Policy provides that where other insurance "is also primary," the policy seeks to establish either "contribution by equal shares" or "contribution by limits." (GAAIC 00225–26.) By comparison, the first section of the CGL Policy provides Continental will "pay only the amount . . . in excess of the amount due from that other insurance, whether you can collect on it or not." (Other Insurance Provision.)

appeared separately "and there is no heading or language in the Policies that puts the insured on notice of" the fact exclusion limited the defense obligation).

Simply put, Continental does not show that at the time it denied coverage under the Real Estate Services Limitation, the insurer also could have refused to defend Curtis Management based on the CGL Policy's Other Insurance Provision.  The Court thus rejects this final ground raised by Continental to justify its failure to defend its insured.

* * *

In sum, Continental refused to defend its insured under the CGL Policy, despite that Lovato's broad allegations raised the possibility of coverage.  Continental pointed to the Real Estate Services Limitation, but the primary insurer failed to show there were extrinsic facts that conclusively demonstrated the exclusion applied.  The insurer's attempt to now rely on the CGL Policy's Other Insurance Provision is similarly unavailing.  Therefore, the Court finds Continental owed a duty to defend Curtis Management from the Underlying Litigation.  The Court grants Great American's Motion seeking a determination on this point, and the Court denies Continental's Cross-Motion on the same issue.

### B.    Subrogation

In light of Continental's failure to defend Curtis Management or participate in the settlement, Great American argues Continental is obligated to reimburse the excess insurer for the $1 million it paid in lieu of Continental.  (Pl.'s Mot. 21:15–24:21.)  Subrogation occurs when one party takes over the legal rights of another for a claim.  *Pulte Home Corp. v. CBR Elec., Inc.*, 50 Cal. App. 5th 216, 228 (2020).  If the party satisfies the underlying obligation, that party is equitably subrogated to the claimant and succeeds the claimant's rights against the obligor.  *Id.*  "In the case of insurance, subrogation takes the form of an insurer's right to be put in the position of the insured in order to pursue recovery from third parties legally responsible to the insured for a loss which the insurer has both insured and paid."  *Id.* (quoting *Fireman's Fund*, 65 Cal. App. 4th at 1291–92).

Subrogation is derivative.  *Fireman's Fund*, 65 Cal. App. 4th at 1292.  "An insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and

succeeds only to the rights of the insured." *Id.* Thus, the subrogating insurer "is said to 'stand in the shoes' of its insured, because it has no greater rights than the insured and is subject to the same defenses assertable against the insured." *Id.* (quoting *Truck Ins. Exch. v. Superior Ct. (Transco Syndicate No. 1)*, 60 Cal. App. 4th 342, 350 (1997)).

To prevail on a claim for equitable subrogation, the plaintiff insurer must show eight elements:

(1)  the insured suffered a loss for which the defendant is liable, either as the wrongdoer whose act or omission caused the loss or because the defendant is legally responsible to the insured for the loss caused by the wrongdoer;

(2)  the claimed loss was one for which the insurer was *not* primarily liable;

(3)  the insurer has compensated the insured in whole or in part for the same loss for which the defendant is primarily liable;

(4)  the insurer has paid the claim of its insured to protect its own interest and not as a volunteer;

(5)  the insured has an existing, assignable cause of action against the defendant which the insured could have asserted for its own benefit had it not been compensated for its loss by the insurer;

(6)  the insurer has suffered damages caused by the act or omission upon which the liability of the defendant depends;

(7)  justice requires that the loss be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer; and

(8)  the insurer's damages are in a liquidated sum, generally the amount paid to the insured.

*CBR Elec.*, 50 Cal. App. 5th at 229 (citation modified) (quoting *Interstate Fire & Cas. Ins. Co. v. Cleveland Wrecking Co.*, 182 Cal. App. 4th 23, 33–34 (2010)).

Before diving into the elements, the Court stresses that Great American is bringing a claim for subrogation—not equitable contribution. Subrogation frequently applies to shift costs "between primary and excess insurers." *Md. Cas. Co. v. Nationwide Mut. Ins.*

*Co.*, 81 Cal. App. 4th 1082, 1088 (2000).  Because of the different obligations owed by primary and excess insurers, an insurer that pays costs that should have been owed by a primary insurer "will frequently obtain a full recovery against the primary insurer on an equitable subrogation theory."  *Id.* at 1089.

By contrast, the theory of equitable contribution "applies to apportion costs among insurers that share the same level of liability on the same risk as to the same insured."  *Id.* Contribution claims arise "when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others."  *Id.* (quoting *Fireman's Fund*, 65 Cal. App. 4th at 1293).  Thus, when "multiple insurance carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its coinsurers for equitable contribution when it has undertaken the defense or indemnification of the common insured."  *Fireman's Fund*, 65 Cal. App. 4th at 1293. With this distinction in the background, the Court turns to the elements for equitable subrogation.

### 1.    A Loss for Which Continental Is Liable

The first subrogation element requires Great American to demonstrate that its insured, Curtis Management, suffered "a loss for which [Continental] is liable."  *See CBR Elec.*, 50 Cal. App. 5th at 229.  In the liability insurance context, the loss occurs when a settlement or judgment is paid.  *Smith v. Parks Manor*, 197 Cal. App. 3d 872, 878–79 (1987).  The insured does not have to cut the check; it is enough that the insured would have suffered the loss had the party seeking subrogation not stepped in to cover the obligation.  *Troost v. Est. of DeBoer*, 155 Cal. App. 3d 289, 294–95 (1984); *Interstate Fire*, 182 Cal. App. 4th at 34.

Great American contends Curtis Management suffered a loss due to the settlement reached in the Underlying Litigation, and Continental is liable for $1 million of that loss under the CGL Policy.  In response, Continental raises several defenses.

### i.    Real Estate Services Limitation

Continental relies on the two exclusions analyzed above to argue it cannot be liable to Curtis Management because there is no indemnity coverage under the CGL Policy. (Def.'s Cross-Mot. 11:3–14:11.)  However, the Court's determination that Continental owed a duty to defend Curtis Management in the Underlying Litigation changes this analysis.  Now, for purposes of subrogation, Great American is the settling insurer, and Continental is the nonparticipating insurer.

In these circumstances, "the settling insurer [meets] its burden of proof when it makes a prima facie showing of coverage under the nonparticipating insurer's policy—the same showing necessary to trigger the recalcitrant insurer's duty to defend—and . . . the burden of proof then shifts to the nonparticipating insurer to prove the absence of actual coverage."  *See Safeco*, 140 Cal. App. 4th at 881.  For the reasons explained above, Great American meets its burden, and Continental now has the burden "to establish that there was no coverage" in light of the Real Estate Services Limitation and its two exclusions. *See id.*

### a.    Professional Services Exclusion

To recap, the Professional Services Exclusion eliminates coverage for an injury "caused by the rendering or failure to render any professional service."  (CGL Policy § B.1.j.)  The Court explained above why this exclusion did not relieve Continental of its duty to defend.  *See supra* III.A.3.ii.  The Court now considers whether Continental shows there is no "actual coverage" in light of this exclusion.  *See Safeco*, 140 Cal. App. 4th at 881.

Continental does not meet its burden.  To start, because the Underlying Litigation settled, there was no determination as to what caused Lovato's trip and fall in December 2019. (*See* JSF ¶ 5 (stipulating that Lovato "*alleged* that he 'tripped and fell on a dangerous single step in a common area walkway'").)  Indeed, in the Settlement Agreement, the underlying parties agreed that no one was "admitting the sufficiency of any claims, allegations, assertions, contentions, or positions of any other party." (JSF Ex. 25.)  Nor is

- 29 -

there an allocation of fault in the Settlement Agreement between the settling defendants. (*See id.*)

Given this record, Continental cannot demonstrate the Professional Services Exclusion applies to Lovato's injury. The facts do not show the injury was "caused by" Curtis Management's professional services (CGL Policy § B.1.j.), as opposed to the injury having occurred "merely at the same time the insured was otherwise providing professional services to" the Windward HOA, *see Food Pro*, 169 Cal. App. 4th at 991; *see also Sequoia Ins. Co.*, 2016 WL 844819, at *7. Hence, the Court rejects this defense to coverage.

### b.    Rental Premises Exclusion

The Court also explored the Rental Premises Exclusion above. *See supra* III.A.3.i. This carveout bars coverage for a bodily injury "arising out of the ownership, operation, maintenance or use of premises held for rental, if" at least one of three criteria also applies. (Real Estate Services Limitation.) The insured must (1) operate, manage, or rent the rental premises for others, (2) collect rents for others, or (3) "[a]ct as a property manager for others." (*See id.*) The question is now whether Continental proves there is no actual coverage in light of the Rental Premises Exclusion.

To that end, the parties stipulate to the undisputed facts bearing on this exclusion. Curtis Management was responsible for managing the Windward Community's common areas, but not any of its separate "family units." (JSF ¶¶ 18–19.) Lovato was a tenant in one of those family units. (JSF ¶ 9.) Further, the landlord for Lovato's unit was an individual named Scott Jordan. (JSF ¶ 10.) Jordan hired Knopp Property Management as the real estate broker for Lovato's unit. (JSF ¶ 12.) Lovato "paid rent to Knopp Property Management," and if an item "broke or got damaged" in his unit, he contacted Knopp Property Management. (JSF ¶¶ 14–15.) It follows that Curtis Management "did not manage, maintain, own, operate, or upkeep" Lovato's rental unit. (JSF ¶ 13.) Finally, Lovato's alleged injury was sustained in the common area, not in his rental unit. (*Id.* ¶¶ 21–22.) Because these facts are undisputed, the parties agree that the Court can determine

23cv1796

whether the exclusion applies as a matter of law.  (*See* Pl.'s Mot. 13:24–16:21; Def.'s Cross-Mot. 11:3–13:9.)

On these facts, the Rental Premises Exclusion does not apply because Curtis Management did not manage any rental property.  And even though Curtis managed common areas for the Windward HOA, the association manager did not manage Lovato's rental unit.

In reaching this conclusion, the phrase "premises held for rental" is a sticking point. Continental argues this phrase should mean the "Windward premises" generally because "[t]hose premises are 'premises held for rental.'"  (Def.'s Cross-Mot. 11:14–17.)  Under this interpretation, Continental believes it would be enough for the exclusion to apply if at least part of the community is owned for rental.  (*Id.* 11:18–19.)

This point is unpersuasive.  The familiar rules of contract interpretation apply to "premises held for rental."[5]  In this context, that phrase is interchangeable with "rental property."  It means property that is owned for the purpose of renting it out to others. Lovato's injury, however, occurred in a shared common area walkway near the community's clubhouse.  There is no evidence that the Windward HOA holds that property—the common area walkway—for rent.  Rather, the Windward HOA holds and maintains the common areas for the benefit of all the owners.  Nor would a layperson share Continental's interpretation.  Hence, the Court agrees with Great American that "premises held for rental" does not capture a shared walkway in a common interest development. (Pl.'s Reply 8:20–9:5.)

---

[5] "[R]eliance on common understanding of language is bedrock."  *See Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal. 4th 854, 867 (1993); *see also* Cal. Civ. Code § 1644 ("The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning[.]").  A phrase's meaning is plain if it is one a "layperson would ascribe to the language of a contract of insurance." *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 667 (1995).  Further, "language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." *Bank of the W. v. Superior Ct.*, 2 Cal. 4th 1254, 1265 (1992) (citation modified).

The Court turns to Continental's fallback argument, which is more nuanced. (*See* Def.'s Reply 5:12–6:2.) It argues the exclusion applies because Lovato was renting a unit, his injury in a common area arose "out of the ownership, operation, maintenance or use of" the unit he rented, and it is enough that Curtis Management was acting "as a property manager for others"—the Windward HOA. (*See* Real Estate Services Limitation.) Under this interpretation, the exclusion would not apply if a homeowner, contractor, or delivery person slipped and fell in a common area of the Windward HOA. (*See id.*) But because Lovato was a tenant of a unit, his injury in the common area arose from premises held for rental. (*See id.*)

Great American counters that when read in context, the exclusion does not apply because "Curtis did not own, operate, maintain or use any premises held for rental and the 'bodily injury' did not arise out of Curtis' ownership, operation, maintenance or use of premises held for rental." (Pl.'s Reply 10:7–10.) Moreover, the injury "occurred in the common area of the property, which Curtis was the property manager for, and not a premises held for rental, which Curtis had no role in renting or maintaining." (*Id.* 10:26–11:2.)

The Court remains unconvinced that the exclusion applies. Initially, Continental's fallback interpretation reads "arising out of" as if it appears in a coverage provision, not an exclusion. To illustrate, in *Truck Insurance Exchange v. AMCO Insurance Co.*, a property was leased to a restaurant, which had a corner doorway entrance that faced an intersection. 56 Cal. App. 5th 623 (2020). Two individuals were injured when a vehicle "crashed through the front doors" and pinned them to a wall. *Id.* The policy covered liability "'arising out of' the restaurant owner's 'use' of the premises." *Id.* at 622. The court found there was a sufficient "minimal causal connection" to conclude the injuries arose from the use of the premises, leading to coverage under the policy. *Id.* at 631–32. It reasoned that connection was sufficient because the individuals were on the premises as customers of the restaurant, and they alleged "that the property itself was dangerous." *Id.*; *see also Kramer v. State Farm Fire & Cas. Co.*, 76 Cal. App. 4th 332, 336–41 (1999) (analyzing whether

there is at least a minimal causal connection between the claims and the use of the property for a coverage clause).

In contrast, here, "arising out of" appears in an exclusion to the CGL Policy, and this language precedes "premises held for rental," as opposed to simply "premises" or "property" in a coverage clause. (*See* Real Estate Services Limitation.)  *Contrast id. with Kramer*, 76 Cal. App. 4th at 334 (considering business liability coverage for use of insured premises), *and Truck Ins. Exch.*, 56 Cal. App. 5th at 630 (construing coverage clause in additional insured provision for use of leased premises).  Further, when the phrase "arising out of" is used in an exclusion to coverage, it is interpreted narrowly against the insurer.  *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Partridge*, 10 Cal. 3d 94, 102 (1973); *accord* Croskey et al., *supra*, at ¶ 4:120.5 ("Some courts have overlooked this distinction and, instead of construing the term narrowly because used in an exclusion, have read it broadly, as if it appeared in a coverage provision.").  Hence, the clause must be read narrowly to exclude only coverage for a bodily injury that stems from use of rental property, not simply an injury arising from use of any property.  *See Partridge*, 10 Cal. 3d at 101 ("[A]n entirely different rule of construction applies to exclusionary clauses as distinguished from coverage clauses.").

Further, as Great American's argument pinpoints, the exclusion "must be read in context."  *Marquez Knolls Prop. Owners Ass'n, Inc. v. Exec. Risk Indem., Inc.*, 153 Cal. App. 4th 228, 234 (2007).  When placed in context, the Rental Premises Exclusion is plainly intended to exclude risks from the insured managing rental property.  But Curtis Management was providing association management services, not managing rental properties for the Windward HOA.  (JSF ¶ 13 (stipulating that Curtis Management "did not manage, maintain, own, operate, or upkeep" Lovato's rental unit).)  *Cf. Marquez*, 153 Cal. App. 4th at 235–36 (rejecting interpretation of exclusionary clause that eliminated the "necessary connection between the insured and the risk that is excluded from the policy").  In other words, the fact that some individual owners decided to rent out their units did not mean Curtis Management became a rental property manager for the community.  Finally,

to the extent that the exclusion was intended to eliminate the risk that led to the claim here, the exclusion does not unambiguously do so. *See Am. Star Ins. Co.*, 232 Cal. App. 3d at 1325 (providing "[a] conspicuous, unambiguous applicable exclusion will override the insuring clause and eliminate coverage the policy might otherwise afford"); *see also State Farm Mut. Auto. Ins. Co. v. Jacober*, 10 Cal. 3d 193, 202 (1973) (providing the insurer has the burden to "phrase exceptions and exclusions in clear and unmistakable language"). Simply put, Continental does not prove that the exclusion applies to Lovato's bodily injury.

In short, under a narrow reading of the Rental Premises Exclusion, Lovato's bodily injury did not arise out of premises held for rental and managed by Curtis Management. Thus, the Court rejects Continental's defense based on this exclusion.

### ii.    Coverage Limited to "Damages"

Continental next argues it is not liable for the loss in the Underlying Litigation because the settlement of Lovato's claims does not constitute "damages" under the CGL Policy. (Def.'s Cross-Mot. 16:23–17:5.) The insurer argues the CGL Policy provides coverage only for "damages," which refers to money ordered by a court. (*Id.*) Thus, because the Underlying Litigation was resolved through settlement and not by judgment, Continental contends the CGL Policy does not cover the loss. (*Id.*)

This defense is unpersuasive because Continental did not fulfill its duty to defend Curtis Management. "When a liability insurer denies coverage and refuses to provide a defense against a third party claim, the insured is free to make the best good faith settlement possible with the third party, including a stipulated judgment with a covenant not to execute." *United Servs. Auto. Ass'n v. Alaska Ins. Co.*, 94 Cal. App. 4th 638, 644 (2001). By extension, "when a liability insurer denies coverage for a third party claim and abandons its insured, it relinquishes the right to object to the manner in which the claim is resolved by the insured or any other insurer providing coverage for the claim." *Id.* Continental therefore could not raise this defense against its insured, Curtis Management, and the defense cannot succeed against Great American for the same reasons. *See id.* ("A contrary rule would render the insured's right to settle meaningless in cases where an insurer denies

liability."); *see also Safeco*, 140 Cal. App. 4th at 880 ("When a duty to defend is shown, nonparticipating coinsurers are presumptively liable for both the costs of defense and settlement.").[6]

### iii.    No-Voluntary Payments Provision

Continental's next defense seeks to rely on the CGL Policy's provision that states: "No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." (CGL Policy § E.2.d.)  Continental argues any liability assumed by Curtis Management in the Underlying Litigation "was incurred without Continental's consent" and violated this provision, relieving the insurer of any indemnity obligation. (Def.'s Cross-Mot. 17:6–22.)

As Great American points out, a no-voluntary payment provision has no force where an insurer chooses not to defend its insured. (Pl.'s Reply 20:15–27.)  The insurer's antecedent breach of its coverage obligation overrides the no-voluntary payments provision. *Jamestown Builders, Inc. v. Gen. Star Indem. Co.*, 77 Cal. App. 4th 341, 348 (1999).  Thus, when an insurer seeks to rely on a no-voluntary payment provision in this circumstance, that insurer is "out of luck." *Id.* at 347; *see also Low v. Golden Eagle Ins. Co.*, 110 Cal. App. 4th 1532, 1546 (2003) (discussing no-voluntary payment provisions and the "exception for insurers who deny tender and abandon their insureds").  That rationale applies here and eliminates Continental's defense based on the CGL Policy's no-voluntary payment provision. *See Jamestown Builders*, 77 Cal. App. 4th at 348.

---

[6]  Moreover, the Court finds this case is distinguishable from those decisions involving a primary insurer who defends a claim but wrongfully refuses to settle it.  Courts are split on whether an excess judgment is required for an excess insurer to bring an equitable subrogation claim in that context. *Compare Fortman v. Safeco Ins. Co.*, 221 Cal. App. 3d 1394, 1402 (1990) (holding an excess judgment is not required), *with RLI Ins. Co. v. CNA Cas. of Cal.*, 141 Cal. App. 4th 75, 83 (2006) (expressly rejecting *Fortman*).  Continental is making a different argument here, but the law also ultimately favors Great American in the refusal-to-settle context. *See RSUI Indem. Co. v. Discover P & C Ins. Co.*, 649 F. App'x 534, 536 (9th Cir. 2016) (concluding "the rule announced in *Fortman* is more likely to be adopted by the California Supreme Court because it more faithfully applies California insurance law"); *see also Ace Am. Ins. Co. v. Fireman's Fund Ins. Co.*, 2 Cal. App. 5th 159, 183 (2016) (following *Fortman*).

Overall, Great American shows its insured suffered a loss that Continental is liable for under the CGL Policy, and Continental's defenses are unpersuasive. The first element for subrogation is satisfied.

### 2.    Great American Is Not Primarily Liable for the Loss

The second element requires Great American to show it is not "primarily liable" for the loss. *See CBR Elec.*, 50 Cal. App. 5th at 229. This element is typically at issue only in insurance disputes like this one. *See Md. Cas. Co.*, 81 Cal. App. 4th at 1089; *Fireman's Fund*, 65 Cal. App. 4th at 1298. The Court must confirm that Great American's insurance policy was not primarily responsible for the loss suffered by Curtis Management. *See Md. Cas. Co.*, 81 Cal. App. 4th at 1089.

The Umbrella Policy obliges Great American "to pay on behalf of the 'Insured' those sums in excess of the 'retained limit' that the 'Insured' becomes legally obligated to pay as damages, by reason of liability imposed by law or assumed by the 'Insured' under an 'insured contract,' because of: . . . 'bodily injury.'" (JSF Ex. 9, at GAAIC 02448.) Among other things, the Umbrella Policy requires the insured to procure general liability insurance for $1 million per occurrence. (*Id.* at GAAIC 02447.) Further, the insurance kicks in only after the underlying insurance and "any other insurance providing coverage to the 'Insured' are exhausted." (*Id.* at GAAIC 02451; *see also* GAAIC 02450 (noting the "retained limit" includes "the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of all other insurance providing coverage to the 'Insured' during the Policy Period").) Hence, the Umbrella Policy shows Great American was providing "excess insurance," not primary insurance. *See Cnty. of San Diego v. Ace Prop. & Cas. Ins. Co.*, 37 Cal. 4th 406, 416 n.4 (2005) (explaining excess insurance is "indemnity coverage that attaches upon the exhaustion of underlying insurance coverage for a claim").

By comparison, the CGL Policy's insuring clause, which the Court analyzed above, provides primary insurance for covered claims. Given the positions of the parties, Great American appears to satisfy the second element because its excess insurance was not

23cv1796

"primarily" liable for the loss. *See Md. Cas. Co.*, 81 Cal. App. 4th at 1088–89. Continental interjects with two counterpoints.

### i.    Other Insurance Provision

First, Continental again relies on the CGL Policy's Other Insurance Provision—this time to show it is not primarily liable for the loss. (*See* Def.'s Cross-Mot. 18:10–18:20; *see also id.* 14:22–27; Def.'s Reply 7:16–21.) The Court analyzed this provision in the context of Continental's duty to defend. *See supra* Part III.A.3.iii.

The Other Insurance Provision does not provide a defense to Great American's subrogation claim. Although such clauses are common, they "become relevant only when several insurers insure the same risk at the *same level* of coverage. An 'other insurance' dispute cannot arise between excess and primary insurers." Croskey et al., *supra*, at ¶ 8:12; *accord Dart Indus.*, 28 Cal. 4th at 1079 n.6 (citing same practice guide); *Travelers Cas. & Sur. Co. v. Am. Equity Ins. Co.*, 93 Cal. App. 4th 1142, 1150 (2001) (same); *see also JPI Westcoast Constr., L.P. v. RJS & Assocs., Inc.*, 156 Cal. App. 4th 1448, 1460 (2007) (relying on same rule). As discussed, there is no genuine dispute that Great American provided excess insurance, and Continental provided primary insurance.

Given this context, the CGL Policy's Other Insurance Provision might have been raised in an equitable contribution dispute between Continental and the other primary insurer, Travelers, but the provision has no impact for Great American's subrogation claim. As such, the CGL Policy's Other Insurance Provision does not defeat the second element of Great American's subrogation claim. *See, e.g.*, *Travelers Cas. & Sur. Co.*, 93 Cal. App. 4th at 1149–50; *JPI Westcoast Constr., L.P.*, 156 Cal. App. 4th at 1460.

### ii.    Indemnity Agreement

Second, Continental argues Great American is primarily liable for the loss because there is an indemnity agreement between Curtis Management and the Windward HOA—Great American's insured. (Def.'s Cross-Mot. 7:26–9:21.) In the Association Management Agreement, the Windward HOA agreed to indemnify Curtis Management from claims arising out of the management and operation of the community, except for

those claims stemming from Curtis's gross negligence or misconduct.  (Ass'n Mgmt. Agmt. § J.1.)

Continental contends this indemnity provision means the Windward HOA "was the only potentially liable party in the Underlying Action and Curtis (Continental's only insured) was fully protected by Windward."  (Def.'s Cross-Mot. 8:18–21.)  Continental also submits that this relationship underscores why Travelers represented both defendants in the Underlying Litigation, as well as why Curtis Management never resorted to filing a cross-action against the Windward HOA to enforce the terms of the indemnity obligation.  (*Id.* 3:23–5:2.)

Continental's indemnity argument falls short.  First, no indemnity determination has been made.  Second, this case is not an equitable contribution action between two primary insurers, which is where a contractual indemnity agreement may be dispositive.  *See, e.g., Hartford Cas. Ins. Co. v. Mt. Hawley Ins. Co.*, 123 Cal. App. 4th 278, 281 (2004) (resolving dispute where two insurers issued CGL policies to a general contractor and its subcontractor, and one agreed to indemnify the other).  For example, if Continental had defended Curtis Management, and Travelers refused to participate or contribute to the settlement, Continental might have sought equitable contribution from Travelers on the theory that the Windward HOA agreed to indemnify Curtis Management.  *See Rossmoor Sanitation, Inc. v. Pylon, Inc.*, 13 Cal. 3d 622, 634 (1975).  But Continental could not have brought such a contribution claim against Great American, the excess insurer.  Further, this case is an equitable subrogation action *against* Continental, the primary insurer.  *See Truck Ins. Exch.*, 16 Cal. 5th at 85 (noting "it has long been the rule that there is 'no contribution between a primary and excess carrier without a specific agreement to the contrary'"); *see also Signal Cos., Inc. v. Harbor Ins. Co.*, 27 Cal. 3d 359, 367 (1980).

Further, where courts have considered subrogation between a primary and excess insurer, the "[e]xistence of a contractual indemnity agreement does not affect the outcome. The primary insurer bears the entire loss *because that is what it bargained for*." Croskey et al., *supra*, at ¶ 9:69.1 (emphasis in original); *see also Reliance Nat'l Indem. Co. v. Gen.*

*Star Indem. Co.*, 72 Cal. App. 4th 1063, 1081–82 (1999); *Vizio, Inc. v. Arch Ins. Co.*, No. 22-55755, 2023 WL 7123784, at *3 (9th Cir. Oct. 30, 2023) (referencing rule).

Indeed, in analogous circumstances, the California Court of Appeal rejected a primary insurer's attempt to use an indemnification clause against an excess insurer's subrogation claim. *JPI Westcoast Constr.*, 156 Cal. App. 4th at 1463. There, the court assumed the "contractual right to indemnity" was "triggered under the facts presented." *Id.* at 1450. The court nevertheless affirmed the trial court's summary judgment on equitable subrogation grounds in favor of the excess insurer and against the primary insurer. *Id.* at 1466. "That holding is conclusive with respect to the present matter. The terms of an indemnity agreement cannot trump general rules governing the application of primary, as opposed to excess, coverage." *See Cont'l Cas. Co. v. St. Paul Surplus Lines Ins. Co.*, 803 F. Supp. 2d 1113, 1122 (E.D. Cal. 2011) (applying the same case).

In short, an indemnity agreement between the Windward HOA and Curtis Management does not show Great American is "primarily liable" for the loss in place of a primary insurer, Continental. The indemnity agreement does not override the terms of the Umbrella Policy and the rules concerning excess and primary insurance. The second element for subrogation is met.

### 3.    Elements (3), (4), (5), (6), and (8)

The next several elements for equitable subrogation, as well as the final element, are straightforward. The $1 million Great American paid is the "same loss for which the defendant is primarily liable," satisfying the third element. *See CBR Elec.*, 50 Cal. App. 5th at 229.

The fourth requirement is met because there is no evidence Great American paid the settlement "as a volunteer," instead of to protect its interests under the Umbrella Policy. *See Hibbs v. Allstate Ins. Co.*, 193 Cal. App. 4th 809, 821 (2011); *see also Am. Safety Indem. Co. v. Admiral Ins. Co.*, 220 Cal. App. 4th 1, 15 (2013) ("There are compelling reasons for allowing recovery when the other insurer has not entered the case at all or has

refused to defend the insured against suit by the injured party. This view represents the current trend and better rule in the 'volunteer' situations." (citation modified)).

Element five is likewise met because there is no contention that Curtis Management's claim under the CGL Policy is unassignable. *See Interstate*, 182 Cal. App. 4th at 36 ("The element . . . asks whether the insured has a cause of action against the defendant which it could have asserted 'had it *not* been compensated for its loss by the insurer.'" (quoting *Fireman's Fund*, 65 Cal. App. 4th at 1292); *see also Fifield Manor v. Finston*, 54 Cal. 2d 632, 642–43 (1960) (concluding personal injury claim that is unassignable by statute could not serve as basis for subrogation).

As to element six, Great American must show it "suffered damages caused by the act or omission upon which the liability of the defendant depends." *See CBR Elec.*, 50 Cal. App. 5th at 229. Because Continental did not contribute the $1 million owed under the CGL Policy, Great American was forced to contribute $1 million more to the settlement under its Umbrella Policy. This element is thus met. *See id.*

In addition, Great American shows the eighth element is satisfied because it is seeking "a liquidated sum"—the $1 million it paid on behalf of the insured. (*See* JSF Ex. 26.) *See CBR Elec.*, 50 Cal. App. 5th at 229. Therefore, elements three, four, five, six, and eight of the subrogation claim are satisfied.

### 4. Equities Favoring Great American

The remaining seventh element concerns the parties' equities. The equities need to favor shifting the loss from Great American to Continental, "whose equitable position is inferior to that of" Great American. *See CBR Elec.*, 50 Cal. App. 5th at 229. This all-or-nothing doctrine is not without criticism, but "the law in California is that the doctrine of superior equities applies in all cases of subrogation." *State Farm Gen. Ins. Co. v. Wells Fargo Bank, N.A.*, 143 Cal. App. 4th 1098, 1111 (2006). The court makes this equitable determination. *Id.* at 1112.

"Though easily stated in general terms, the element of balancing the equities lacks specificity in details." *Valley Crest Landscape Dev., Inc. v. Mission Pools of Escondido,*

*Inc.*, 238 Cal. App. 4th 468, 484 (2015). "[T]here is no facile formula for determining superiority of equities, for there is no formula by which to determine the existence or nonexistence of an equity except to the extent that certain familiar fact combinations have been repeatedly adjudged to create an equity in the surety or the third party." *State Farm*, 143 Cal. App. 4th at 1112 (quoting *Hartford Acc. & Indem. Co. v. All Am. Nut Co.*, 220 Cal. App. 2d 545, 558 (1963)).

Thus, there are several guideposts. First, an insurer seeking subrogation "will always have superior equities" against the party directly responsible for the loss, such as "a dishonest employee, burglar, or fire starter." *State Farm*, 143 Cal. App. 4th at 1112–13. That rationale is inapplicable here.

Second, "[w]here the third party is an indirect cause of the loss, because it contributed to or permitted the loss, the court must differentiate between primary and secondary causes of loss to determine whether the third party was in a better position to avoid the loss." *Id.* at 1117; *see Cont'l Ins. Co. v. Morgan, Olmstead, Kennedy & Gardner, Inc.*, 83 Cal. App. 3d 593, 604 (1978) (illustrating that where a bonded employee forges a check and the bank pays the check, the bank's conduct is "secondary," and the bank "is not in a better position to avoid the loss than is the insured's employer"); *see also Meyers v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 11 Cal. 2d 92, 102 (1938). That theory is of little help here, too.

Third, "there is a division of decisional authority on whether an insurer is entitled to subrogation against a party who by a separate contract has agreed to assume responsibility for the same loss and is not responsible for causing the loss." *Reliance Nat'l Indem. Co.*, 72 Cal. App. 4th at 1081. One California Court of Appeal decision concluded a third-party's indemnity agreement should not be enforced in favor of the insurers seeking subrogation because the indemnifying contractor did not cause the fire leading to the loss. *Pat. Scaffolding Co. v. William Simpson Const. Co.*, 256 Cal. App. 2d 506, 515–17 (1967). "Age and subsequent appellate court opinions have not been kind to" that decision, though. *Valley Crest*, 238 Cal. App. 4th at 491. Other decisions "have held that the terms and

circumstances of the indemnity agreement may compel the conclusion that the indemnitor, in equity, should bear the entire loss even though the indemnitor did not cause the loss." *Truck Ins. Exch. v. Cnty. of Los Angeles*, 95 Cal. App. 4th 13, 25–26 (2002) (collecting cases).

Fourth, though much has been written, courts tend to find this element favors the excess insurer in a subrogation dispute between a primary and an excess insurer. *See Reliance Nat'l Indem. Co.*, 72 Cal. App. 4th at 1080–83 (canvassing the equities and reasoning if the court accepted "the arguments of [the primary insurer], the basic rules construing primary and excess policies would be altered"); *see also JPI Westcoast Constr.*, 156 Cal. App. 4th at 1460 ("Moreover, like the *Reliance* court, we do not think the equities favor the primary carrier, Transcontinental.").

Ultimately, then, a major part of the equities assessment here is the same fact the Court has repeatedly relied upon: the parties' involvement as excess and primary insurers. The Court must still, however, weigh the equities to ensure that Great American should prevail.

To that end, many of Continental's arguments touch upon the equities. It points to the fact that Curtis Management did not tender a claim under the CGL Policy until a year and a half after the Underlying Litigation was filed. (Def.'s Cross-Mot. 10:11–18.) In Continental's view, Travelers and Great American waited until the last minute "to assert that the [CGL] Policy might apply to the loss—despite the fact that the Continental Policy was issued only to Curtis (not Windward) and that Curtis was entitled to complete defense and indemnity from Windward and, by extension, Windward's insurers (Travelers and Great American)." (*Id.*) As discussed above, Continental also points to the indemnity obligation between the Windward HOA and Curtis Management, which Continental argues was strategically not invoked to prejudice the primary insurer. (*Id.* 4:15–23.) Thus, Continental contends allowing subrogation would "reward Great American with a windfall," and it does not further the goal of making insurers pay their fair share. (*Id.* 10:19–26.) Continental further argues that Great American insured greater risks than

Continental with the attendant higher policy premiums, making it inequitable to shift the loss onto the primary insurer "who insured Curtis only." (Def.'s Reply 6:3–27.)

Great American contends "[t]he simple fact here is that [Continental] is engaging in post-claims underwriting." (Pl.'s Mot. 2:12.) The excess insurer argues Continental made a "pre-determined business decision to deny all claims at locations other than its insured's offices under its Small Business Program, despite the policy language providing coverage for such claims." (*Id.* 2:13–15.) To this end, since Lovato's injury, Continental "amended its policies to expressly limit coverage for injuries occurring away from its insured's premises." (*Id.* 2:16–17; *see also* Vogrin Decl. ¶ 9, Ex. G (showing subsequent policies included such an endorsement to unambiguously limit coverage for Curtis Management).) Great American also undercuts Continental's reliance on the purported premiums for the large Umbrella Policy. (Pl.'s Reply 17:6–18:18.)

On balance, the Court finds the equities favor the excess insurer, Great American. The distinction between primary and excess insurance is convincing here for the same reasons expressed in other cases. *See JPI Westcoast Constr.*, 156 Cal. App. 4th at 1464 ("We share the extremely important concerns voiced by the *Reliance* court that 'the basic rules construing primary and excess policies would be altered' if we accepted [the primary insurer's] argument.").

Further, Continental's arguments do not persuasively tip the scales. It claims the other participants in the Underlying Litigation treated Continental unfairly, but Continental never referenced the indemnity obligation, the Other Insurance Provision, or many of the other grounds it now raises when denying coverage and refusing to defend Curtis Management. Again, the evidence shows Continental was not even aware of whether part of the Windward Community was held for rental when Continental issued its coverage denial. *See supra* Part III.A.3.i.

Moreover, Continental had access to other avenues to protect its interests, including defending under a reservation of rights, as well as filing a declaratory relief action if Continental discovered evidence showing the absence of any potential coverage. *See Great*

*Am. Ins. Co. v. Superior Ct.*, 178 Cal. App. 4th 221, 234–35 (2009); *see also Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 279 (1966) ("In any event, if the insurer adequately reserves its right to assert the noncoverage defense later, it will not be bound by the judgment."); *Buss v. Superior Ct.*, 16 Cal. 4th 35, 48 (1997) (providing that where an insurer reserves its rights, the insurer can seek reimbursement for certain defense costs where claims are not covered).

In addition, when Continental denied coverage on February 9, 2022, it had enough time to investigate the case and raise these issues. (JSF ¶ 45.) The Underlying Litigation settled months later after repeated requests for Continental to reconsider its coverage position and to participate in the settlement negotiations. (JSF ¶¶ 65–72.) The record does not show Continental ever requested more information or time to investigate the incident. Therefore, Continental's suggestion that the other participants unfairly waited until "the eve of trial, long after all pleadings were settled," to submit a claim to Continental is not compelling. (Def.'s Cross-Mot. 10:14.)

Continental's argument concerning the indemnity agreement has some appeal, but that argument is not enough to shift the equities in its favor. Allowing subrogation "does not entirely negate the indemnity clause." *See JPI Westcoast Constr.*, 156 Cal. App. 4th at 1464. Instead, this outcome reflects the reality that the damages in the Underlying Litigation were so high. *See id.* The parties agree that $2.75 million was "a reasonable settlement figure based on the injuries Mr. Lovato alleged he sustained." (JSF ¶ 81.) Under California precedent, Continental "would have been entitled to subrogate to [Curtis Management's] right to contractual indemnification against [Travelers] had the damages in the case been $1 million (the [Travelers] policy limit) or less." *See JPI Westcoast Constr.*, 156 Cal. App. 4th at 1464. However, because the settlement amount consumes both primary policies, the indemnity agreement does not have the same impact as it might in other circumstances. *See id.*

Finally, the Court cannot find the equities favor Continental where the insurer did not uphold its duty to defend Curtis Management. To conclude otherwise would reward

Continental's refusal to fulfill its obligations under the CGL Policy and California law. If permitting subrogation results in a windfall to Great American, it is better for the windfall to go to the insurer who fulfilled its coverage obligations, rather than the one who breached them. And Great American is not escaping unscathed; it contributed an additional $750,000 to the settlement beyond what is at issue here. Therefore, the Court finds Continental's equity position is inferior to Great American's position, resolving the remaining subrogation element. *See CBR Elec.*, 50 Cal. App. 5th at 229.

In sum, all the elements for equitable subrogation are satisfied as a matter of law. The Court grants Great American's Motion for Summary Judgment on this claim and denies Continental's Cross-Motion.

### C.    Equitable Indemnity

The Court briefly addresses Great American's third claim for equitable indemnity against Continental. "Equitable indemnification is similar to equitable subrogation in that it also enables an insurer that has paid an obligation which was entirely the responsibility of a co-insurer to place the complete burden for the loss on that other party,' but '[t]he party seeking reimbursement through indemnification . . . does so in [its] own right (as with a contribution claim).'" *Travelers Indem. Co. of Conn. v. Navigators Specialty Ins. Co.*, 70 Cal. App. 5th 341, 363 (2021) (quoting *Travelers Indem. Co. of Conn. v. Hudson Ins. Co.*, 442 F. Supp. 3d 1259, 1269 (E.D. Cal. 2020)).

"In applying California law, federal courts have come to differing conclusions on the issue of whether a claim for equitable indemnity—like a claim for equitable contribution—is unavailable between carriers who do not share the same level of obligation on the same risk to the same insured." *Navigators Specialty Ins. Co.*, 70 Cal. App. 5th at 363 n.17 (collecting cases). In *Navigators Specialty*, the California Court of Appeal expressed it was "unaware of any California authority directly on point," and therefore did "not express any view on the matter." *Id.*

Here, the Court has already determined that Great American is entitled to all the relief it seeks on equitable subrogation grounds. Further, at oral argument, Great American

agreed that the Court does not need to reach this alternative theory if Great American prevails on the subrogation claim. (ECF No. 49.) Therefore, the Court goes no further.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff Great American's Motion for Summary Judgment and **DENIES** Defendant Continental's Cross-Motion for Summary Judgment. Great American is entitled to declaratory relief that Continental owed a duty to defend their mutual insured, Curtis Management. The Court also finds summary judgment is appropriate in favor of Great American and against Continental on the equitable subrogation cause of action. Finally, the Court finds it unnecessary to reach the alternative theory for relief, equitable indemnity. No later than ten days following the entry of this Order, Great American shall lodge with the Court a proposed Judgment.

**IT IS SO ORDERED.**

DATED: August 11, 2025

**Hon. Cynthia Bashant, Chief Judge**
**United States District Court**

23cv1796